UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
MIDLAND-ODESSA DIVISION

| | | |
|---|---|---|
| Jerry Clayton Gift, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| *v.* | § | No. 7:22-CV-00122-DC-RCG |
| | § | |
| Anadarko Petroleum Corporation | § | |
| Change of Control Severance Plan, | § | |
| Occidental Petroleum Corporation, | § | |
| and Anadarko Petroleum | § | |
| Corporation Health and Welfare | § | |
| Benefits Administrative Committee, | § | |
| | § | |
| *Defendants.* | § | |

**JERRY GIFT'S RESPONSE TO DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT AND BRIEF IN SUPPORT**

## TABLE OF CONTENTS

The Table of Contents is bookmarked.

TABLE OF AUTHORITIES

LOCAL RULE CV-7(D)(1) STATEMENT OF REASONS FOR OPPOSITION TO MOTION

OBJECTION TO STATISTICAL EVIDENCE

ARGUMENT AND AUTHORITIES

A.    Plan interpretation

1.    COC Plan basics

2.    Good reason: plan and interpretive guidance
      require individualized assessment specific to participant

3.    COC Plan interpretive guidance requires
      adequate training for a new job duty

B.    Lack of full and fair review for OCC claim

C.    Abuse of discretion: factual determination

1.    conflict of interest

      a.    committee: highly compensated Oxy executives

      b.    plan benefits paid out of Oxy general assets

      c.    committee attorney: fiduciary conflict

2.    Oxy financial problems: context and motive to deny benefits

3.    no concrete evidence to support denial, unreasonable decision

      a.    summary of good reason issues: Kermit OCC and procedure writing

      b.    no concrete evidence

c.      lack of rational connection —
        ignoring known industry terms and practices

## Table of Authorities

### Cases

*Ariana M. v. Humana Health Plan of Tex., Inc.*
    884 F.3d 246 (5th Cir. 2018)

*Conkright v. Frommert*
    559 U.S. 506 (2010)

*Koehler v. Aetna Health Inc.*
    683 F.3d 182 (5th Cir. 2012)

*Lain v. Unum Life Ins. Co. of Am.*
    279 F.3d 337 (5th Cir. 2002)

*Michael P. v. Blue Cross & Blue Shield of Tex.*,
    No. 20-30361, 2021 WL 4314316 (5th Cir. Sept. 22, 2021)

*Napoli v. Johnson & Johnson, Inc.*
    No. 14-31000, Fastcase Database, (5th Cir. Sept. 8, 2015)

*Metropolitan Life Ins. Co. v. Glenn*
    554 U.S. 105 (2008)

*Pierre v. Conn. Gen. Life Ins. Co.*
    932 F.2d 1552 (5th Cir. 1991), *overruled on other grounds*,
    *Ariana M. v. Humana Health Plan of Tex., Inc.*, 884 F.3d 246 (5th Cir. 2018)

*Robinson v. Aetna Life Ins. Co.*
    443 F.3d 389 (5th Cir. 2006)

*Vega v. Nat'l Life Ins. Servs., Inc.*
    188 F.3d 287 (5th Cir. 1999), *overruled on other grounds by*
    *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008)

*Wilbur v. ARCO Chem. Co.*
    974 F.2d 631 (5th Cir. 1992)

### Statutes

29 U.S.C. § 1133

**LOCAL RULE CV-7(D)(1) STATEMENT OF REASONS FOR OPPOSITION TO MOTION[1]**

Gift raises a material fact issue for trial on abuse of discretion. The benefit denial lacks any supporting *concrete* evidence and so is not supported by substantial evidence. The benefit process violated full and fair review requirements — in part because the committee changed its reason for denial. Gift also offers evidence of conflict of interest, bias in the fact-finding process, motive to deny claims, and situations in which the committee did what it had no discretion to do. The motion should be denied as moot on the pay reduction issue because Gift never pursued that issue with the committee and has not brought suit on that issue.

**OBJECTION TO STATISTICAL EVIDENCE**

Gift objects to the statistical evidence offered to support the motion. The testimony on statistics lacks any foundation. The data itself has never been produced, so the evidence is not admissible as a summary. Gift specifically requested monthly statistics so assess whether approvals dropped after the severe economic downturn at Oxy, and Defendants objected.[2]

---

[1] This response is supported by a separately filed *Appendix in Support of Jerry Gift's Response to Defendants' Motion for Summary Judgment.* The Appendix is bates-labeled on the bottom left and is cited as "App.," followed by the bates-labeled appendix page.

Unless otherwise noted, Gift's attorneys have supplied all emphases, omitted all internal quotation marks and internal citations from case quotations, and omitted all citing and quoting references from case citations.

[2] *See* App., pp. 292-293.

## ARGUMENT AND AUTHORITIES

### A.    Plan interpretation

*We therefore conclude that evidence that is relevant in determining whether under our two-step framework, an administrator's interpretation of a plan was legally correct, and if not, whether the administrator abused his discretion, may be considered by a district court even if this evidence was not part of the administrative record.*

*—Wilbur v. ARCO Chem. Co.*,
974 F.2d 631, 642 (5th Cir. 1992)

The Fifth Circuit has a two-step framework for assessing abuse of discretion in plan interpretation. First, courts decide whether the administrator's plan interpretation was legally correct.[3] Second, if not legally correct, courts decide whether the administrator abused its discretion.[4]

For step one, courts must consider 3 factors: (1) whether the administrator has given the plan a uniform construction, (2) whether the interpretation is consistent with a fair reading of the plan, and (3) any unanticipated costs resulting from different plan interpretations.[5] Courts give plan language "ordinary and generally accepted meaning."[6]

If the plan's interpretation is not legally correct, step two involves 3 important factors: (1) internal consistency of the plan under the administrator's interpretation, (2) any relevant regulations, and (3) the factual background of the decision and any inferences of lack of good faith.[7]

---

[3] *Wilbur v. ARCO Chem. Co.*, 974 F.2d 631, 637 (5th Cir. 1992).

[4] *Id*. at 637, 638.

[5] *Id*. at 637-38.

[6] *Koehler v. Aetna Health Inc.,* 683 F.3d 182, 187 (5th Cir. 2012).

[7] *Wilbur*, 974 F.2d at 638.

At this point, there does not appear to be disagreement over the meaning of plan terms. At this point, the disagreement centers on (a) whether the administrator followed its own plan and plan interpretation guidance and (b) whether the administrator abused its discretion to decide facts.

1.      **COC Plan basics**

The COC Plan[8] was intended to encourage focus on work and prevent a mass exodus of employees in the event of a looming or possible change of control, like sale or merger.[9] It promises separation benefits for certain employment separations that take place within a certain time after a change in control.[10] There is no dispute that a change of control took place when Oxy acquired Anadarko on or about August 8, 2019.[11] There is no dispute about timing, timeliness, or Gift's status as a participant.[12]

2.      **Good reason: plan and interpretive guidance**
        **require individualized assessment specific to participant**

The COC Plan pays benefits if a participant ends his employment for *good reason*. The good reason provision at issue involves requiring a participant to work in a position or assignment for which he or she is not skilled or trained. It says:

---

[8] Appendix Exhibit 1 has a table of abbreviated terms.

[9] *See* App., p. 82, plan introduction.

[10] *See, e.g.,* App., p. 89, plan article IV § 4.1.

[11] App., pp. 298, 301, 302, 305.

[12] App., pp. 300, 304.

> (vi)   the Participant is required, without the Participant's prior written consent, to perform in a job position, or a substantial job assignment, for which he or she is not skilled or trained.[13]

The plan language requires an individualized assessment of skill and training — *for which he or she*. It does not consider what others have done. It does not consider generic job titles or job descriptions. It looks to the individual participant, like Gift.

The committee's own interpretive guidance supports this position. Two sets of guidance each say:

> Whether a Good Reason event has occurred involves a review of the facts and circumstances specific to the individual Participant.[14]

**3.   COC Plan interpretive guidance requires adequate training for a new job duty**

The committee's own interpretive guidance shows that training is required for new job duties.[15] It also shows that a job duty may be new, and so require adequate training, even if within an employee's traditional field of work.[16] It provides two examples:

---

[13] App., p. 87.

[14] App., pp. 120, 124.

[15] *See* App., pp. 386, 388-89, 390, 392-93.

[16] *Id.*

> Example: An employee is given a new job assignment that is within the employee's traditional field of work and is sent to a week-long training class that is appropriate to prepare the employee to perform the new job duty. This provision has not been met.
>
> Example: An employee is given a new job assignment that is outside of the employee's traditional field of work and given five days of training. It is not reasonable to expect that a typical employee could perform the new job duty after only five days of training. This provision has been met.[17]

## B.     Lack of full and fair review for OCC claim

When, in a final appeal decision, an administrator changes it reason for denying benefits, the administrator violates ERISA's requirement of full and fair review.[18] ERISA requires that a plan:

(1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

(2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.[19]

When an administrator changes its reason for denial during the appeal process, the participant "never ha[s] an opportunity to contest at the administrative level this new basis for terminating his benefits."[20] The "lack of a full and fair review is an independent basis to overturn an administrator's denial of benefits."[21] At a minimum, it is evidence of abuse of discretion.

---

[17] *See* App., pp. 386, 388-89, 390, 392-93.

[18] *See generally Robinson v. Aetna Life Ins. Co.*, 443 F.3d 389, 392-94 (5th Cir. 2006).

[19] 29 U.S.C. § 1133.

[20] *Robinson*, 443 F.3d at 393.

[21] *Napoli v. Johnson & Johnson, Inc.*, No. 14-31000, Fastcase Database, p. 7 (5th Cir. Sept. 8, 2015).

Here, the committee originally denied the claim concerning work in the Kermit OCC because the coverage duty was allegedly voluntary.[22] In the final denial letter, the committee raised a new basis for denial — a measurement technician's claim that training was not required to work in the Kermit OCC.[23] Note that the good reason inquiry process is not part of the benefit claim process.[24]

## C.    Abuse of discretion: factual determination

The essence of review for abuse of discretion turns on whether a decision is reasonable and impartial.[25] The Fifth Circuit overruled the *Pierre v Connecticut General Life Ins. Co.* holding that courts owe deference to fiduciary fact findings even absent plan language conferring discretion.[26] But The Fifth Circuit did not disturb that portion of the *Pierre* holding limiting deference to "an administrator's factual conclusions that reflect a reasonable and impartial judgment."[27]

The current Fifth Circuit substantial evidence standard for abuse-of-discretion ERISA cases is incorrect in light of United States Supreme Court direction, for the reasons explained in Justice

---

[22] App., pp. 204 (letterhead) & 205 (reason).

[23] App., pp. 209 (letterhead, measurement technician) & 211 (reason).

[24] *See* App., p. 220.

[25] *See, e.g.*, *See Conkright v. Frommert,* 559 U.S. 506, 521 (2010) (discussing fiduciary's duty to "exercise[s] [its] discretion honestly and fairly."); *Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 301 (5th Cir. 1999) ("A review of the evidence available to National Life at the time it denied the claim illustrates that its decision was not reasonable."), *overruled on other grounds by Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008).

[26] *Ariana M. v. Humana Health Plan of Tex., Inc.*, 884 F.3d 246 (5th Cir. 2018).

[27] *Pierre v. Conn. Gen. Life Ins. Co.*, 932 F.2d 1552, 1562 (5th Cir. 1991), *overruled on other grounds*, *Ariana M. v. Humana Health Plan of Tex., Inc.*, 884 F.3d 246 (5th Cir. 2018).

Oldham's concurring opinion cited here.[28] But summary judgment is improper even under the substantial evidence standard.

1.      **conflict of interest**

> *a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits; and that the significance of the factor will depend upon the circumstances of the particular case*

> —*Metropolitan Life Ins. Co. v. Glenn*,
> 554 U.S. 105, 108 (2008)

a.      **committee: highly compensated Oxy executives**

The committee members [plan administrators] were all Oxy employees.[29] And they were all Oxy executives, with two exceptions.[30] One of those exceptions still participated in a deferred compensation top hat plan,[31] had an annual salary over $200,000,[32] was eligible for bonuses based in part on Oxy performance,[33] owned Oxy stock, and participated in an Oxy stock plan.[34]

---

[28] *Michael P. v. Blue Cross & Blue Shield of Tex.*, No. 20-30361, 2021 WL 4314316, *10 (5th Cir. Sept. 22, 2021) (per curiam ) ("It appears that we've wandered far astray. The Supreme Court warned us not to use LMRA principles to review ERISA claims. We did so anyway. And then we adopted a flavor of substantial-evidence review that bears little resemblance to one we'd use in an administrative law case. All of this makes it particularly difficult for ERISA beneficiaries to vindicate their rights under the cause of action created by Congress. And it does so with no apparent support in law, logic, or history.") (Oldham, J., concurring).

[29] App., p. 47, Grommesh Dep. p. 7 lines 6-12.

[30] App., p. 65, Knight Dep. p. 15 lines 6-17.

[31] App., p. 65, Knight Dep. p. 16 lines 10-22;

[32] App., p. 66, Knight Dep. p. 18 lines 6-15.

[33] App., p. 66, Knight Dep. p. 18 lines 16-19 & p. 19 lines 14-18.

[34] App., p. 66, Knight Dep. p. 20 lines 8-13.

Another committee member and Oxy executive based in Houston[35] is now Vice President of business development for all United States onshore assets.[36] While a committee member, he had a base salary over $300,000,[37] was eligible for cash bonuses based on Oxy performance and Oxy stock option bonuses,[38] and owned Oxy stock.[39] His highest recent bonus was around $900,000.[40]

### b.    plan benefits paid out of Oxy general assets

COC Plan benefits are paid from Oxy general assets.[41] The COC Plan also makes Oxy financially responsible for payment of benefits.[42] So, Oxy potentially benefits from each denied claim under the COC Plan. And Oxy employees and executives on the committee are being paid from the same pool of funds and receive bonuses based on Oxy performance.

---

[35] App., p. 47, Grommesh Dep. p. 7 lines 19-20; App., p. 48, Grommesh Dep. p. 9 lines 20-21; see also App., p. 47, Grommesh Dep. p. 7 line 21 through p. 8 line 1.

[36] App., p. 47, Grommesh Dep. p. 8 lines 17-19.

[37] App., p. 48, Grommesh Dep. p. 12 lines 19-24.

[38] App., pp. 48-49, Grommesh Dep. p. 12 line 25 through p. 13 line 15; p. 14, 4-16.

[39] App., p. 49, Grommesh Dep. p. 14 lines 1-3.

[40] App., p. 49, Grommesh Dep. p. 14 line 21 through p. 15 line 6.

[41] *See* App., pp. 116-117.

[42] App., p. 95.

c.       committee attorney: fiduciary conflict

For legal services concerning the COC Plan, attorney Lisa Barton believes her clients are (a) the plan and (b) the committee members who serve as plan administrator and so plan fiduciaries.[43] So, she believes her fiduciary duties run to the plan and the committee members.[44] She says her attorney role is "not as an ERISA fiduciary."[45] Oxy pays her firm hourly for her to do training and "assist[] the committee with their duties."[46]

A reasonable inference, then, is that Barton zealously represents the plan and plan fiduciaries, but not plan participants like Jerry. And that is a problem because Barton prepares the meeting minutes and the denial letters.[47] Barton does not believe she is operating under any duty to the participants. So, she can do things the fiduciaries *cannot* when recording minutes and preparing letters.

It is also arguable that, in advising on plan administration, Barton owed fiduciary duties to participants like Jerry. "An ERISA plan is a separate legal entity from its sponsor [], and a plan's administrator owes a fiduciary duty to the plan's beneficiaries, not its sponsor."[48] "When an

---

[43] App., p. 28, Barton Depo, p. 5 line 23 through p. 6 line 7.

[44] App., p. 28, Barton Depo, p. 6 line 11 through p. 7 line 5.

[45] App., p. 28, Barton Depo, p. 7 lines 2-4.

[46] App., pp. 28-29, Barton Depo, p. 8 line 9 through p. 9 line 9; *see also* App., p. 28, Barton Depo, p. 8 lines 3-8.

[47] App., pp. 289, 292.

[48] *Wilbur v. ARCO Chem. Co.*, 974 F.2d 631, 645 (5th Cir. 1992).

attorney advises a plan administrator or other fiduciary concerning plan administration, the attorney's clients are the plan beneficiaries for whom the fiduciary acts, not the plan administrator."[49]

## 2.      Oxy financial problems: context and motive to deny benefits

After the change in control, Oxy faces financial pressures, plunging oil prices, and many who question the wisdom of the Anadarko acquisition. Per *Forbes*:

> Oxy stole Anadarko out of from under Chevron [] at the end of their hugely expensive bidding war. But even at the time, most analysts questioned the wisdom of acquiring so much additional debt — including an infusion of $10 billion from Warren Buffet — to pay a premium price for Anadarko and its assets.[50]

Around six months after the merger, the pandemic hits, oil prices crater [down to *negative* $37.63 a barrel], and "the specter of layoffs loomed."[51] "Oxy stock, worth $47 a share in January [2020], had dropped by March 9 [2020] to about $12 and would stay in that cold, dark nether region for months."[52]

Once the pandemic hit, Oxy shut reduced operations "considerably," shutting down drilling and frac crews.[53] Because it was not profitable — oil prices are negative at some point.[54] Oxy "tried

---

[49] *Wilbur v. ARCO Chem. Co.*, 974 F.2d 631, 645 (5th Cir. 1992).

[50] David Blackmon, *Oxy Struggles To Cope With The Impacts Of Its Acquisition Of Anadarko*, FORBES (Aug. 11, 2020).

[51] *See* Mimi Swartz, *How the Most Hyped U.S. Oil Merger in a Decade Went Bust*, TEXAS MONTHLY (Feb. 2021).

[52] *Id.*

[53] App., p. 48, Grommesh Dep. p. 10 lines 13-24.

[54] App., p. 48, Grommesh Dep. p. 10 line 25 through p. 11 line 10.

to cut our costs."[55] As oil prices are tanking, there is talk about whether the Oxy takeover of Anadarko was working out.[56]

In this atmosphere, as shown below, Oxy is not keen to paying overtime wages. Nor is it keen to replacing employees who quit. And that is leading to requiring employees like Jerry to take on job assignments for which they are not skilled or trained.

### 3.    no concrete evidence to support denial, unreasonable decision

*Q.··When it comes to monitoring pipelines for public safety, financial safety, like property damage, and proper delivery, is it ever a good idea to put an untrained and unskilled person in that position? A. I would say no …*

—Lisa Barton, Oxy Committee & Plan Attorney,
App., p. 40, Barton Depo p. 53, lines 10-15

"Without some concrete evidence in the administrative record that supports the denial of the claim, [courts] must find the administrator abused its discretion."[57] An administrator's decision to deny benefits must be "based on evidence, even if disputable, that clearly supports the basis for its denial."[58]

---

[55] App., Grommesh Dep. p. 11, line 6.

[56] App., Grommesh Dep. p. 11 lines 11-19.

[57] *Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 302 (5ᵗʰ Cir. 1999), *overruled on other grounds by Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008).

[58] *Lain v. Unum Life Ins. Co. of Am.,* 279 F.3d 337, 342 (5ᵗʰ Cir. 2002).

Even "the substantial evidence standard does require the administrator to rely on more than conclusory statements and cursory references."[59] Courts "owe no deference" to "unsupported suspicions."[60]

Courts are not required to accept uncorroborated hearsay as support for a benefit denial. The Fifth Circuit explains. "On review, however, we can require that the hearsay meet certain indicia of reliability; if it does not, the abuse of discretion standard permits the court to reject the finding."[61] And it poses a hypothetical: an uncorroborated, hearsay statement from an interested witness.[62] It explains: the "abuse of discretion standard would permit us to conclude that, because of the witness's self-serving interests, the decision to deny benefits based on this statement, without more, would be beyond the bounds of a reasonable judgment."[63]

### a.    summary of good reason issues: Kermit OCC and procedure writing

Gift worked as a GGS Foreman.[64] During the financial hard times for Oxy, the *procedure writer* quit. Rather than fill this now-vacant position, management requires Gift to take on *procedure writer*

---

[59] *Napoli v. Johnson & Johnson, Inc.*, No. 14-31000, Fastcase Database, p. 7 (5th Cir. Sept. 8, 2015).

[60] *Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 302 (5th Cir. 1999), *overruled on other grounds by Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008).

[61] *Pierre v. Conn. Gen. Life Ins. Co.*, 932 F.2d 1552, 1562 (5th Cir. 1991), *overruled on other grounds, Ariana M. v. Humana Health Plan of Tex., Inc.*, 884 F.3d 246 (5th Cir. 2018).

[62] *Id.* at 1563.

[63] *Id.*

[64] This summary for procedure writing is based on the administrative record evidence at App., pp. 162-199.

job duties on top of his existing duties as operations foreman. But Gift has no training or skills as a procedure writer. It is undisputed that Gift has no procedure writing experience.

Not long after that, there's another employee-fill issue.[65] Management does not want to pay overtime "at all" to Kermit OCC employees. But someone must cover the duties of Kermit OCC employees when they are absent, such as for paid time off or medical leave. Management tells Gift that, on top of his duties as operations foreman, he is expected to fill 12-hour shifts for absent Kermit OCC employees. But Gift has no training or skills as an operations control center employee. It is undisputed that Gift has no OCC experience. The OCC Foreman David Gales raises concerns about placing untrained people in the Kermit OCC.[66]

b.      no concrete evidence

The only evidence arguably supporting the benefits denial in the minutes that Lisa Barton took.[67] The subcommittee minutes wrongly call Gift a pipeline foreman. The other minutes contain conclusions and irrelevant statements from call-in speakers. There is no audio recording, video recording, transcript, or witness statement that shows the full content of what these speakers actually said. There is no evidence as to these speakers' alleged qualifications to speak to these issues. There is no evidence of who selected these speakers or how. And many of the statements are just irrelevant. For example, discussion about regulations does not address whether training was

---

[65] This summary for the Kermit OCC is based on the administrative record evidence at App., pp. 136-161.

[66] App., p.146.

[67] App., pp. 138-145.

actually required in the Kermit OCC. In reality, training was required and critical because the OCC is a safety-critical operation.[68]

### c.    lack of rational connection — ignoring known industry terms and practices

*Likewise, evidence, including expert opinion, that assists the district court in understanding the medical terminology or practice related to a claim would be equally admissible.*

—*Vega v. Nat'l Life Ins. Servs., Inc.*, 188 F.3d 287, 302 (5th Cir. 1999),
*overruled on other grounds by Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008)

An administrator abuses its discretion when its decision lacks "a rational connection between the known facts and the decision or between the found facts and the evidence."[69] Fiduciaries must understand basic industry terms and practices relevant to a claim. As Barton put it: "So I guess I would just say that, you know, my understanding of ERISA is that you don't have to be an expert, but if you don't have an expert, you need to find an expert."[70]

Here, the findings reflect a lack of any rational connection — or plain bias. The findings and analysis ignore industry terms. Two declarations address those industry terms as is permitted under ERISA.[71] One of those is from the head of the Kermit OCC at the time. For example, the

---

[68] App., pp. 6-11 (qualifications to speak to industry terms and practices) &pp. 12-15 (addressing complexity, safety critical nature of, and training required for an OCC).

[69] *Lain v. Unum Life Ins. Co. of Am.,* 279 F.3d 337, 342 (5th Cir. 2002).

[70] App., p. 34, Barton Depo, p. 29 lines 16-19; *see also* for context question at Barton Depo, p. 28 lines 12-16 & question and answer at Appendix, Barton Depo, p. 29 lines 14-23. Barton does not have firsthand knowledge of the depth or quality of the industry knowledge the committee members had. App., p. 36, Barton Depo, p. 37 lines 6-14.

[71] App., pp. 6-18, David Gale Declaration; App., pp. 19-25, Jerry Gift Declaration.

committee claims it spoke with a "measurement technician" to address the Kermit OCC. But a measurement technician is not qualified to speak to that issue.[72] As another example of bias, over-reach, abuse ... or lack of basic knowledge of industry terms ... an operations foreman is just a generic term for manager. It does not mean, as the committee implies, knowledge of all operations. What it means depends on the specific context, like OCC foreman, Pipeline foreman, Gas Gathering System Foreman, etc.[73]

Discretion for fiduciaries is constrained by those fiduciary duties. Fiduciaries cannot spin facts, ignore important evidence, consider less than all the evidence submitted, or misstate the contents of records. And they must understand or undertake to understand basic industry terms and practices concerning the claim. The motion should be denied.

---

[72] App., p. 15, 24.

[73] App., pp. 15-16, 23-24.

Respectfully submitted,

*/s/ Amy Gibson*

_____

Mr. Paul H. Millican
Texas Bar No. 14146700
paulm@ghtxlaw.com

Gossett, Harrison, Millican & Stipanovic
P.O. Drawer 911
San Angelo, Texas 76902
T: (325) 653-3291
F: (325) 655-6838

Ms. Amy E. Gibson
Texas Bar No. 00793801
amy@gwfirm.com

Mr. David L. Wiley
Texas Bar No. 24029901
david@gwfirm.com

Gibson Wiley PLLC
1500 Jackson Street #109
Dallas, Texas 75201
T: (214) 522-2121
F: (214) 522-2126

*Attorneys for Jerry Gift*

**CERTIFICATE OF SERVICE**

The undersigned certifies that on September 27, 2023 before 5:00 p.m., she filed *Jerry Gift's Response to Defendants' Motion for Summary Judgment and Brief in Support* with the United States District Clerk for the Western District of Texas through the CM/ECF System, such that Defendants should be served with a copy of the filed document as follows:

**VIA CM/ECF**

Ms. Shauna Johnson Clark
shauna.clark@nortonrosefulbright.com
Ms. Kimberly F. Cheeseman
kimberly.cheeseman@nortonrosefulbright.com
Mr. Andrew Yeh
andrew.yeh@nortonrosefulbright.com
Norton Rose Fulbright US LLC
1301 McKinney #5100
Houston, Texas 77010-3095
Attorneys for Defendants

*/s/ Amy Gibson*

Amy E. Gibson